UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 01237**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AJILON PROFESSIONAL STAFFING, LLC,

          Plaintiff,

    v.

SOLOMON-PAGE GROUP, LLC, ANDREW
SMITH, MICHELLE ROBEY, ROSE ZIZZO, and
PAVEL SOBOTKO,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x



COMPLAINT

Plaintiff Ajilon Professional Staffing, LLC ("Ajilon"), by its undersigned attorneys, and

for its Complaint against Defendants Solomon-Page Group, LLC ("Solomon-Page"), Andrew

Smith ("Smith"), Michelle Robey ("Robey"), Rose Zizzo ("Zizzo"), and Pavel Sobotko

("Sobotko") (Smith, Robey, Zizzo, and Sobotko are the "Individual Defendants"), alleges as

follows:

## NATURE OF THE ACTION

1.     This suit arises out of the initially independent but later concerted efforts of

Solomon-Page and the Individual Defendants to misappropriate Plaintiff Ajilon's proprietary and

confidential information for their own benefit to, among other things, steal Ajilon's clients. The

irreparable harm in this case is as overwhelming as it is obvious. The Individual Defendants and

Solomon-Page's wrongful behavior constitutes a willful and deliberate violation of various

contractual and statutory obligations and needs to be remedied through injunctive relief.

2.     On information and belief, Defendant Solomon-Page has been making a

concerted effort to target Ajilon's offices throughout the country and solicit Ajilon's employees

and, through those employees, Ajilon's confidential client information and data. Ajilon's

Hauppauge, New York, office became the latest victim of Solomon-Page's scheme when Solomon-Page recently decided to open an office on Long Island. Solomon-Page lured the Individual Defendants and their pilfered Ajilon proprietary information into the fold, and thus began their Long Island office.

3.     Plaintiff Ajilon is a premier specialty staffing and recruiting services firm, on Long Island and throughout the world. Ajilon works directly with both employer clients looking to fill temporary and permanent job openings and with employee candidates looking for such positions. Ajilon's success has been built in large part on the basis of the client relationships and candidate relationships it has and continues to develop and nurture. As a result, Ajilon guards its proprietary confidential information jealously and zealously.

4.     The Individual Defendants are former employees in Ajilon's Hauppauge office. When they began working for Ajilon, they each signed employment agreements in which they promised not to disclose Ajilon's confidential information or to use it for their own purposes. The employment agreements also contained limited non-competition and non-solicitation provisions.

5.     The Individual Defendants each resigned from Ajilon on January 24, 2008. Prior to their departure, they plotted together to purloin Ajilon's confidential and proprietary information concerning, among other things, its employer clients and employee candidates. They later disclosed this highly valuable information to their new employer, Solomon-Page. Defendants Smith and Robey, in particular, began plotting to harm Ajilon almost a year before they left Ajilon.

6.     The Individual Defendants have stolen thousands of files containing Ajilon's confidential and proprietary information and are now using that information for the benefit of

themselves and their new employer, Solomon-Page. The information in these files includes, but is not limited to, the following:

- Client lists and files
- Candidate resumes and applications
- Ajilon financial information
- Placement records and commission sheets
- Candidate references
- Contact information for human resources personnel at client companies
- Permanent placement materials
- Training materials
- Human resources materials

7.     By disclosing Ajilon's confidential and proprietary information to Solomon-Page, the Individual Defendants have armed that company with the tools it needs to steal Ajilon's customers and candidates and succeed in the Long Island marketplace. Without this information, Solomon-Page would have virtually no potential customer information and would be unable to make any job placements. It would have to start from scratch to find clients and candidates and create its own relationships with them.

8.     On information and belief, Defendants are using Ajilon's confidential information to contact and solicit Ajilon's clients. In doing so, the Individual Defendants have breached their employment agreements. Moreover, the Defendants have misappropriated Ajilon's confidential and proprietary information. Without equitable relief, they will undoubtedly continue to do so, thus causing great and irreparable harm to Ajilon.

## THE PARTIES

**Plaintiff**

9.     Ajilon is a Delaware limited liability company with its principal place of business in Saddle Brook, New Jersey 07663. Its sole member is Adecco N.A., LLC. Adecco is owned by ASI Staffing, Inc., a Delaware corporation with its principal place of business in New York.

**Defendants**

3

10. Smith is a former Ajilon employee, who is currently employed by Solomon-Page. On information and belief, Smith resides in New York and is a citizen of that state.

11. Robey is a former Ajilon employee, who is currently employed by Solomon-Page. On information and belief, Robey resides in New York and is a citizen of that state.

12. Zizzo is a former Ajilon employee, who is currently employed by Solomon-Page. On information and belief, Zizzo resides in New York and is a citizen of that state.

13. Sobotko is a former Ajilon employee, who is currently employed by Solomon-Page. On information and belief, Sobotko resides in New York and is a citizen of that state.

14. Solomon-Page is a Delaware limited liability company with its principal place of business in New York, New York.

### JURISDICTION AND VENUE

15. This Court has personal jurisdiction over Defendants Smith, Robey, Zizzo, and Sobotko because, on information and belief, each Individual Defendant: (i) is a resident and citizen of this State; and (ii) regularly conducts business within this State.

16. This Court has personal jurisdiction over Defendant Solomon-Page because, on information and belief, it: (i) is a resident of this State; (ii) is authorized to conduct business in this State; and (iii) regularly conducts business in this State.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

18. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(1) and (c) because, on information and belief, all of the Defendants reside in this State, and Defendant Solomon-Page is a resident of the Southern District of New York.

## STATEMENT OF FACTS

19.     Ajilon is one of the premier specialty staffing and recruiting services firms operating in the United States today.  Ajilon specializes in working with prospective employers and employees in staffing permanent and temporary positions in accounting, financial, legal, marketing and human resources positions.

20.     Ajilon has offices located throughout the country, including an office located in Hauppauge, New York.  Ajilon's Hauppauge office services clients located primarily in Long Island, New York.

21.     Ajilon's Office and Finance division services a current client base of more than 100 companies that are searching for employees to perform accounting, finance and business functions.

22.     Ajilon's Office and Finance division also provides placement services to individuals seeking accounting, finance and business positions with Ajilon's clients.  Ajilon assists these individuals in securing such employment positions.

23.     Ajilon has devoted considerable time and resources to establishing itself in the Long Island marketplace.  Key to Ajilon's success is its proven ability in cultivating both a large client base and a large pool of attractive employment candidates.  These resources work hand-in-hand to fuel Ajilon's business success.  Thus, job candidates are attracted to Ajilon because Ajilon has numerous job positions that it is seeking to fill, and companies are attracted to Ajilon because Ajilon has a pool of talented candidates looking for new job placements.  Ajilon's business and individual clients are Ajilon's "crown jewels," and Ajilon has worked tirelessly to establish significant relationships with them.

### Ajilon's Proprietary Information

24.     Ajilon maintains proprietary information critical to the operation of Ajilon's business. The information includes detailed intelligence on Ajilon's clients and candidates that Ajilon painstakingly developed and collected over many years. Ajilon maintains much of its proprietary information on its computer network.

25.     Among Ajilon's proprietary information are confidential client files which both identify Ajilon's clients and provide additional critical information allowing Ajilon to best serve these clients' needs. Ajilon's clients are neither known to nor obvious to the outside world. For example, many companies are not interested in using job placement services such as those that Ajilon provides and prefer to fill jobs without paying fees for outside, expert assistance. Thus, Ajilon's client files identify those companies in the Long Island area with a demonstrated willingness to use job placement services. In addition to identifying Ajilon's clients, these files also contain detailed information regarding the clients' wants and needs, the skill sets which the clients value and wish their job candidates to possess, the salary ranges which the clients are willing to pay their job candidates, the fees that the clients are willing to pay Ajilon for its job placement services, and key contact people at the client. Knowing this information gives Ajilon a competitive edge, because it allows Ajilon to match candidates to clients with a high degree of success based on Ajilon's deep and broad knowledge of its clients' needs. Based on this knowledge, Ajilon is able to send job candidates to its clients who are exactly the kind of candidates the clients want to see, which leads to a high level of client satisfaction and, in turn, to clients returning to Ajilon time and again for new placements. As a result, Ajilon has developed important client relationships supported by trust and goodwill.

26.     Ajilon also possesses detailed information regarding a vast number of potential job candidates, including information regarding these candidates' job and salary histories,

interview notes regarding the candidates' skills and desires, and detailed references from the candidates' prior jobs. Ajilon has developed a long-term relationship with many of its candidates, and Ajilon follows their career developments, providing Ajilon with both depth and breadth of information about them. Again, Ajilon uses this information to successfully match candidates to clients. Ajilon is able to use this candidate information proactively as well, reaching out to its clients (with success) to present them with promising job candidates even if the clients do not have pending job orders with Ajilon.

27.     Ajilon's detailed intelligence on clients and candidates was developed by Ajilon through years of painstaking effort and expense.

28.     Ajilon maintains the confidentiality of its confidential information, including with respect to the computer systems on which confidential information may reside. Ajilon requires its employees to sign employment agreements in which the employees promise to maintain the confidentiality of this information and acknowledge that such information is not for personal use. Only authorized users may log into Ajilon's computer system through use of an authorized login and password. Each time Ajilon's employees log into Ajilon's computer system, they are reminded, in writing, that they are accessing confidential materials and of their confidentiality obligations, and they must click "OK" acknowledging their agreement to maintain Ajilon's confidential information before they may access such information.

29.     The Individual Defendants had access to Ajilon's confidential and proprietary information over the course of their employment.

**Ajilon Invests Resources in Its New Recruiters**

30.     Ajilon invests significant resources in its recruiters through extensive training, which teaches recruiters how to perform their jobs effectively. In addition, Ajilon devotes considerable resources to its marketing program and its infrastructure, which assist recruiters in finding job orders to fill. Ajilon's goodwill and reputation provide recruiters with credibility when they meet with clients and candidates. As recruiters at Ajilon, the Individual Defendants reaped the benefits of Ajilon's investments.

31.     On information and belief, Defendants Sobotko, Robey, and Smith had no recruiting industry experience prior to their employment at Ajilon. Zizzo alone had some recruiting experience when she joined Ajilon in the summer of 2007 from Robert Half Finance & Accounting, where she had worked for less than two years.

32.     Ajilon provided each of the Individual Defendants with specialized job training. The Individual Defendants attended intensive one-week "High Intensity Training" programs, in which they were trained to work as Executive Recruiters and taught job skills honed by Ajilon employees over the years. Each of the Individual Defendants received on-the-job training and attended weekly staffing meetings where active job orders were discussed and strategies developed to fill those job order positions.

33.     As Executive Recruiters, the Individual Defendants were introduced to a multitude of Ajilon clients and were responsible for particular client relationships. The Individual Defendants were supported by a well-developed infrastructure, including dedicated sales and business development personnel responsible for soliciting and obtaining job orders for the Individual Defendants to fill. Ajilon also invested in maintaining comprehensive and up-to-date job postings on websites such as Monster.com.

34.    Ajilon also provided the Individual Defendants with substantial resources to pursue their marketing efforts.  The goodwill and reputation Ajilon has established among its clients and candidates provided the Individual Defendants with client contacts and credibility. Ajilon also financed a variety of marketing activities, including client lunches, dinners and entertainment events.  The Individual Defendants used the reputation, good will, information and sales support provided by Ajilon, on Ajilon's time and expense, to establish relationships with Ajilon's clients and candidates.

### Ajilon Protects Its Business Through Reasonably Tailored Employment Agreements.

35.    Mindful of its significant investments in developing its detailed intelligence on prospective employers and job candidates as well as in developing savvy Ajilon employees and strong client relationships, Ajilon protects its investment by having employees execute appropriate Employment Agreements.  Each of the Individual Defendants executed such Employment Agreements (the "Employment Agreements").

### Non-Solicitation Provisions

36.    In the Employment Agreements, each of the Individual Defendants promised not to directly or indirectly solicit all employer clients and prospective employees that have applied or done business with Ajilon within at least one year before employment ended (the "Non-Solicitation Provisions").

37.    For example, Zizzo's Agreement read, in pertinent part:

**11.    LIMITATION ON SOLICITATION OF CLIENTS:** The Employee agrees that the Employer has invested substantial resources, time and effort to identify, obtain, and retain the Employer's Clients, as defined in paragraph 9 above, and that Employer has a protectable interest in its relationships with its Clients.

Therefore, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or

indirectly solicit the Employer's Clients that conducted business with the office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

\*\*\*

**12.    LIMITATION ON SOLICITATION OF CANDIDATES:** The Employee agrees that the Employer has invested substantial time, resources and effort to identify, obtain and retain the Employer's Candidates, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Candidates.

Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that had contact with the branch office(s) at which the Employee was employee during the twelve (12) months preceding the termination of his/her employment.

A copy of Zizzo's Employment Agreement ("Zizzo Agreement"), as well as copies of the other

Individual Defendants' Employment Agreements are attached to the Affidavit of Janette Marx,

dated February 5, 2008 (Marx Aff.), as Exhibit A.

38.    Sobotko's Employment Agreement contained identical provisions. *See id.*, Ex A

(Sobotko Agreement), at ¶¶ 11-12.  Smith's and Robey's agreements contained similar

provisions, which also bar them from soliciting any Ajilon customers for one year. *See id.*, Ex.

A (Smith Agreement), at ¶ 11A; (Robey Agreement), at ¶ 11A.

39.    Each of the Individual Defendants agreed that in the event any of them broke this

promise Ajilon would be entitled to injunctive relief. *See id.*, Ex. A (Zizzo Agreement), ¶ 15;

(Sobotko Agreement), ¶ 15; (Robey Agreement), ¶ 11C; (Smith Agreement), ¶ 11C.  For

example, Zizzo's Agreement read:

**15.    INJUNCTIVE RELIEF:** In the event of an actual or threatened breach by the Employee of the provisions of Paragraphs 9, 10, 11, 12 or 13, the Employer shall be entitled to an injunction enforcing the terms of Paragraphs 9, 10, 11, 12 or 13 and restraining further violations thereof.  Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available

10

to the Employer arising from such breach or threatened breach, including the recovery of damages from the Employee.

*Id.*, Ex. A (Zizzo Agreement), ¶ 15.

### Protection of Confidential Information

40.    Each of the Individual Defendants also promised not to use Ajilon's confidential information for his or her own purposes, and each promised not to place any of Ajilon's confidential information onto any personal computer or other data collection device not owned by Ajilon (the "Confidentiality Provisions"). Each of the Individual Defendants agreed that in the event any of them broke this promise, Ajilon would be entitled to injunctive relief.

41.    For example, Zizzo's Employment Agreement read, in pertinent part:

**9.    ACCESS TO, DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION:** The Employee recognizes and acknowledges that s/he has access to the identity of and information concerning the Employer's Clients and Candidates, including specifically, but not limited to, data contained in the Employer's secured databases and Web portals (including but not limited to Searcher, Ajility, A-Zone, Adecco CRMS, C-Net, MAD and KPI). The Employee also recognizes that s/he has access to the Employer's specific marketing and training methods, techniques and guides, as well as the Employer's pricing, forms and internal operating systems and procedures.

The above constitutes the Employer's "Confidential Information," which is a valuable, special and unique asset of the Employer's business.

\*\*\*

The Employee will not during the term of his/her employment, use the Employer's Confidential Information for his/her own purposes. In addition the Employee will not disclose the Employer's Confidential Information to any person, firm, corporation, association, or other entity, for any reason or purpose whatsoever.

The Employee will not during the term of his/her employment, without the express written consent of the Employer, place the Employer's Confidential Information into personal computers or other personal data collection and storage devices that are not owned by the Employer. The Employee understands and agrees that s/he is not in any event permitted to copy any or all of the Employer's Confidential Information or to provide access to the Employer's Confidential Information to any other person except for another current employee of the Employer. The Employee shall, within a period of not more than two (2) business

days, return any and all copies of the Employer's Confidential Information to the Employer in the event the employment relationship between the Employer and the Employee is terminated by either party at the specific request of the Employer at any time during the term of such employment.

\*\*\*

In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from:

    A.    disclosing the Employer's Confidential Information; or

    B.    rendering any services to any person, firm corporation, association, or other entity to whom the Employer's Confidential Information has been disclosed, in whole or in part, or is threatened to be disclosed, by the Employee.

*Id.*, Ex. A (Zizzo Agreement) at ¶ 9.

    42.    Sobotko's Employment Agreement contains an identical provision. *See id.*, Ex. A (Sobotko Agreement) at ¶ 9. Smith's and Robey's contained similar provisions. *See id.*, Ex. A (Smith Agreement) at ¶ 10; (Robey Agreement) at ¶ 10.

### Non-Compete Provisions

    43.    In the Employment Agreements, each of the Individual Defendants also promised not to compete against Ajilon for a period of one year, within thirty-five (35) or fifty (50) miles of Ajilon's Hauppauge office, depending on the contract (the "Non-Competition Provisions"). Each of the Individual Defendants agreed that in the event any of them broke this promise, Ajilon would be entitled to injunctive relief.

    44.    For example, Zizzo's contract read, in pertinent part:

**10.**    **LIMITATION ON COMPETITIVE ACTIVITIES:**  While employed AND for a period of one (1) year after the termination of his/her employment with the Employer, the Employee will not engage in any competitive activities within thirty-five (35) miles from the present office(s) of the Employer at which the Employee is employed or from any other office where the employee was employed over the last twelve (12) months of employment.

Competitive activities are specifically defined as directly or indirectly owning, managing, operating, controlling, participating in, being employed by consulting, advising or being connected in any way with a similar Staffing Service.

\*\*\*

For employees with responsibilities relating to the Employer's Ajilon Finance line of business, a similar Staffing Service shall be defined as a Staffing Service that places financial personnel including but not limited to Chief Financial Officers, Controllers, other financial executives, accountants, bookkeepers, and accounting clerks.

*Id.*, Ex. A (Zizzo Agreement), at ¶ 10.

45.     Sobotko's Employment Agreement contains an identical provision. *See id.*, Ex. A (Sobotko Agreement) at ¶ 10.  Smith's and Robey's contained similar provisions, which bar them from engaging in competitive activities within a fifty-mile radius of any Ajilon office for one year. *See id.*, Ex. A (Smith Agreement) at ¶ 11A; (Robey Agreement) at ¶ 11A.

46.     Each of the Individual Defendants agreed that in the event any of them broke this promise, Ajilon would be entitled to injunctive relief. *See id.*, Ex. A (Zizzo Agreement), ¶ 15; (Sobotko Agreement), ¶ 15; (Robey Agreement), ¶ 11C; (Smith Agreement), ¶ 11C.

47.     Finally, each of the Individual Defendants signed a provision governing their conduct as Ajilon employees (the "Code of Conduct Provision"), stating, in pertinent part:

6.     **CODE OF CONDUCT:** Employee is expected at all times to conduct him/herself in a professional manner, to promote the reputation and interest of AJILON.  Employee shall make true reports as required from time to time by AJILON.  Employee shall make available to AJILON any information relevant to AJILON's operations and planning and make suggestions that can benefit AJILON.

**The Attack Upon Ajilon**

## Solomon-Page's Campaign to Interfere Unlawfully with Ajilon

48.     On information and belief, Solomon-Page is engaged in a campaign to damage and harm Ajilon through unlawful means.  Solomon-Page has embarked on a widespread effort

to poach Ajilon's employees extending far beyond Ajilon's Hauppauge offices. In 2006, for instance, Solomon-Page poached a division manager and a permanent division lead from Ajilon's New York City office. Defendant Smith "investigated" this matter for Ajilon, but no action was pursued by him. (Upon information and belief, one of these "poached" employees, Kevin Gilligan, in turn reached out to Smith in an attempt to lure Smith to Solomon-Page.)

49.     Solomon-Page recently induced employees to leave Ajilon's Washington, D.C. office and encouraged these employees to breach their confidentiality obligations to Ajilon (just as is being done here). Those parties are involved in litigation in D.C. regarding Solomon-Page's unlawful conduct.

50.     Solomon-Page specifically targeted the Individual Defendants in order to open an office of its own on Long Island, an area Solomon-Page did not previously cover at all. On information and belief, Solomon-Page would have no chance of quick success in the Long Island market but for its use of the confidential client and candidate information stolen from Ajilon by the Individual Defendants. The Individual Defendants have now launched Solomon-Page's Long Island office, relying on confidential client contact information they improperly took from Ajilon.

**The Individual Defendants' Scheme**

51.     On information and belief, in late January or early February 2007, Smith, Robey and Lisa Walling ("Walling"), the Permanent Division Lead in the Hauppauge office, decided to leave Ajilon and start their own business.

52.     Smith, Robey, and Walling formed a business plan for their new company in March 2007.

53.     On information and belief, in about April of 2007, Kevin Gilligan, a former Ajilon employee who was now working at the New York office of Solomon-Page, contacted

Smith and Robey to offer them positions at Solomon-Page. He informed them that Solomon-Page was interested in having them open a Solomon-Page branch office on Long Island, where Solomon-Page had previously no presence.

54.     Smith was initially reluctant to move to Solomon-Page, as he wanted to open his own business and did not want to work for another established company. He knew, however, that he would face significant legal exposure if he started a competing business on Long Island, and Solomon-Page assured him that it would pay any legal fees that might result should the Individual Defendants work for Solomon-Page. In addition, Solomon-Page had agreed to let Smith, Robey and Walling work for them without agreeing to be bound by any non-compete/non-solicitation provisions.

55.     As a result, Smith formed a new plan. He, Robey and Walling would work for Solomon-Page for one year, so that Solomon-Page would pay their legal fees associated with any litigation with Ajilon. They would then quit Solomon-Page and start their own company, free and clear of any non-compete or non-solicitation obligations.

56.     Smith wrote to his Ajilon co-worker and then-girlfriend Traci Wootten through Ajilon's instant message program, Trillian:

> [Smith]: what are your thoughts on doing a start up on LI if they protect you from the non-compete
> [Wootten]: me- or you?
> [Smith]: you.  salary at least 120K one office but can get an AVP title

A compilation of relevant Smith instant messages (the "IMs") is attached to the Marx Aff. as Exhibit B.  IMs at 9.

57.     In August, Smith's plans were firming up and he decided he would simply stop showing up for work at Ajilon, while still collecting his paycheck:

15

> [Smith]: so here is my new plan: I am not going to quit. I am just going to stop coming to work after my vacation in October. since you will have stepped back there will be no one responsible to see when I am or not here. I can get another month of draw out of them while I set things up with Steve
> [Walling]: then we all walk out together?
> [Smith]: I will already be gone and they will fire me at some point. Then you guys walk on 1/1/08.

IMs at 3.

### The Individual Defendants Purloin Ajilon's Confidential Information To Take to Solomon-Page

58.     On information and belief, Smith and his group conspired for months to steal confidential information from Ajilon in anticipation of leaving Ajilon and joining Solomon-Page. On information and belief, Smith copied as much of Ajilon's confidential customer information as possible into his own files. In that vein, he downloaded many Ajilon files onto his own Ajilon-issued Dell laptop. In a "Get Smart" like switch-a-roo, Smith downloaded numerous confidential files from Ajilon's computer database onto the hard drive of his Ajilon-issued Dell laptop. Smith then took this hard drive out of his laptop and switched it with a hard drive from a forgotten company laptop that had broken long ago. Smith turned his now "broken" laptop in to the company, and took the forgotten company laptop (containing the Ajilon data downloaded by Smith) home with him.

59.     This was not the first time that Smith had stolen Ajilon property. Indeed, Smith bragged about history of computer theft to Wootten in an IM exchange from September 26, 2007:

> [Smith]: before you do the inventory, there is a desk top in the RVP office I can snag for [your son]
> [Wootten]: if it is not on my list
> [Smith]: even if it is on the list it can disappear
>
> ***

[Smith]: *I have done this in the past with the laptops and desktops we got rid of in the past*
[Wootten]: done what?
[Smith]: had the XUaoc/XUtemp thing removed so that it just boots right up without the password. If my idiot brother can get rid of it I am sure Tommy can do it for [your son]
[Smith]: It ended up in there because it was on [Zizzo's] desk when she moved next to [Robey]
[Smith]: *it can easily disappear*
[Wootten]: can you get me the tag on it?
[Wootten]: the one in my office is not on the list
[Smith]: *Ok check the one in Dawn's and I will swap it if necessary*

IMs at 10.

60.    Robey too, "cleaned" a computer taken from Ajilon, as she admitted on

November 27, 2007, in an instant message exchange with Smith:

[Robey]: do you know anyone on the geek squad?
[Smith]: no, no geek squad
[Robey]: *I need to "clean" that computer* - who should I call?
[Smith]: why? did someone say something?
[Robey]: no . . . but I really am giving it to Matt – so I need to clean it, and *I figure the quicker I do it, the better off we are so if/when they ask me for it, I can tell them that I've already erased everything.*
[Smith]: First you need to pull all your info off. You can then call teletachies
[Robey]: I know…but I figured I could just have them do everything to make sure it's done right….*they could transfer everything to the external hard drive - then clean it up*…but I dont' know who can do that for me
[Smith]: teletechies

IMs at 12 (emphasis added).

61.    Smith and Robey continued making plans to leave Ajilon, eventually recruiting

Zizzo to join them. Smith discussed the plans with Zizzo in late November, encouraging her to

act like a good Ajilon employee while they worked out the timeline for their move. *See* IMs at 2.

Smith also boasted that "the best thing about this deal is that there is complete legal protection

from the non-competes, even the one you have with R1/2 [Robert Half Agency]." *Id.*

62.     In late 2007 Walling saw stacks of resumes and printed screenshots from Ajility on the printer shared by Smith, Robey, and Zizzo – fifty or more screenshots at a time.  They had no legitimate business purpose for printing out numerous company records.  On information and belief, Smith, Robey and Zizzo were printing these records for their own purposes, so they could take this confidential company information with them to Solomon-Page.

63.     Smith also informed a colleague that he was contemplating coming into the office on a Saturday afternoon and copying the stacks of candidate resumes that were lying on various recruiters' desks.  On information and belief, he was planning to copy them so he could take them with him to Solomon-Page.

64.     Zizzo was also compiling customer information to bring to Solomon-Page:

[Smith]: why are you looking to bail so bad? Are you OK?
[Zizzo]: great, I have a list of contacts thAT i can't wait to do business with.
[Zizzo]: When are you coming in this week?
[Smith]: exactly!!!! speaking of.  Can you get me ann marie Wilson's phone number out of Ajility.  Thanks
[Smith]: I will be there tomorrow
[Smith]: can you get me that  number?

IMs at 13.

65.     On January 22, 2008, Zizzo was informed that Ajilon was investigating her, Smith's and Robey's activities and later that day, Zizzo left the office and informed Smith and Robey of the investigation.  Smith did not come into the office the next day, nor did he respond to a voicemail that his supervisor left on his cell phone, asking him to return his call.  The following day, January 24, 2008, Robey, Smith, Zizzo, and Sobotko resigned.

66.     According to an expert analysis of the metadata on Smith's hard drive, Defendant Smith downloaded approximately 5,000 files onto his laptop computer the morning of January 23, 2008, the day before he resigned from Ajilon, and the day after he learned Ajilon was

investigating his suspicious behavior. Smith also connected, or remoted, a portable storage device to that computer within minutes after completing this document dump.

67.     These 5,000 files include documents containing confidential and proprietary information belonging to Ajilon, including Ajilon budgets, candidate resumes, client files, references, "gold sheets" (*i.e.*, documents reflecting that job placements have been made), training materials, human resources materials, and permanent placement materials.

68.     These types of documents are extremely valuable to Solomon-Page because Solomon-Page did not have a Long Island branch office until the Individual Defendants left Ajilon. Therefore, Solomon-Page would have minimal client or candidate information for Long Island job positions. The information downloaded by Smith gives Solomon-Page immediate access to all types of candidates and their resumes. In addition, the "gold sheets" identify the hiring managers at the appropriate companies, the fee percentage that Ajilon receives from these placements, and the salaries of people who were placed. Through the human resources materials, Solomon-Page will know who to contact at various companies for hiring needs. And access to training materials allows Solomon-Page to effectively train new recruiters, based on methods that Ajilon has been developing for years.

**The Individual Defendants Join Solomon-Page to Create Solomon-Page's Long Island Office and Further Harm Ajilon**

Since resigning from Ajilon, the Individual Defendants have teamed up with Solomon-Page to open a Solomon-Page branch office on Long Island, less than ten miles from Ajilon's Hauppauge office.  The Defendants are in direct competition with Ajilon and have already begun soliciting Ajilon's clients.

### Improper Solicitation of Clients And Stealing Ajilon's Existing Job Orders

69.    On January 28, 2008, Defendant Robey met with an Ajilon supervisor and brazenly admitted that the Individual Defendants were intent on contacting Ajilon's Office and Finance division clients as soon as possible.

70.    On information and belief, the Defendants are exploiting the reputation, goodwill, and confidential information acquired by the Individual Defendants during their employment with Ajilon to directly compete with Ajilon and to threaten the client base and employees that are the foundations of Ajilon's business.

71.    On information and belief, the Individual Defendants are soliciting a number of Ajilon clients and candidates since their resignation from Ajilon, through the use of Ajilon's confidential information.

72.    On information and belief, the Defendants have converted for their own use, and are seeking to fill, job orders that Ajilon clients placed with Ajilon and not Solomon-Page, also through the use of Ajilon's confidential information.

### Ajilon Is Suffering from Irreparable Harm

73.    Ajilon's success is built upon its client relationships and the goodwill it has generated with its customers and job candidates.  Defendants' use of these relationships and the confidential information gathered by Ajilon over the years to advance the competing interests of Solomon-Page would irreparably damage the trust and goodwill Ajilon has spent many years and

millions of dollars developing with its client base and could result in the loss of, or damage to, important client relationships. Indeed, clients are overwhelmingly likely to place new business with the placement firm that successfully placed their last job order. If Defendants are able to fill Ajilon's job orders currently, using Ajilon's confidential information, these clients will likely not return to Ajilon in the future, thus permanently harming Ajilon's business operations. Only injunctive relief barring Defendants from misusing Ajilon's confidential information, soliciting Ajilon's clients, candidates and employees would prevent this harm.

74.     The Individual Defendants stole, and are now using, confidential and proprietary information including Ajilon budgets, candidate resumes, client files, references, "gold sheets" (*i.e.*, documents reflecting the terms and other information of successful job placements), training materials, human resources materials, and permanent placement materials.

75.     This information is invaluable to Solomon-Page and would give it a competitive advantage because it did not have a Long Island branch office until the Individual Defendants left Ajilon. Therefore, Solomon-Page would have minimal client or candidate information for Long Island job positions. The information downloaded by Smith gives Solomon-Page immediate access to all types of candidates and their resumes. In addition, the "gold sheets" identify the hiring managers at the appropriate companies, the fee percentage that Ajilon receives from these placements, and the salaries of people who were placed. Through these materials, Solomon-Page will know which companies are Ajilon clients, which companies use job placement services for financial positions, and who to contact at various companies for hiring needs. Access to training materials allows Solomon-Page to effectively train new recruiters, based on methods that Ajilon has been developing for years. In addition, some of these materials

relate to Ajilon's New York City business, a location where Ajilon also competes with Solomon-Page but for which the Individual Defendants had no recruiting responsibility.

## COUNT I

### (MISAPPROPRIATION OF TRADE SECRETS)

### (AGAINST ALL DEFENDANTS)

76.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

77.    Ajilon has developed and is the owner of valuable trade secrets, including detailed intelligence concerning the identities, references, job progressions, skill sets, salary histories and customer feedback for candidates for employment, as well as similar intelligence concerning the identities, contacts, needs, and preferred skill sets for its clients.

78.    The trade secrets described herein, as well as other trade secrets, are proprietary to Ajilon and are not generally known to the public or others who can obtain economic value from their disclosure or use.  Ajilon derives independent economic value from the fact that these trade secrets are not generally known.

79.    Ajilon has expended significant efforts and sums of money over the years to obtain, compile, and organize this information, which is unique to Ajilon.

80.    At all relevant times, Ajilon has used and continues to use reasonable efforts to protect the confidentiality of its trade secrets.

81.    At all relevant times, Ajilon has derived an economic benefit and leadership advantage in its industry because of this information and by vigilantly protecting its trade secrets and not permitting or allowing such information to be accessed or used by anyone without express or implied duty or obligation to Ajilon to maintain the secrecy thereof.

82.     The value of this information to Ajilon's competitors, particularly competitors such as Solomon-Page, which has no presence in the Long Island financial recruiting market, is incalculable, as it would take years and extraordinary effort to compile a similar set of information.

83.     Ajilon provided these trade secrets to the Individual Defendants in confidence, and the Individual Defendants agreed to maintain the confidentiality of these trade secrets during and after their employment with Ajilon.

84.     On information and belief, Defendants have, and continue to, misappropriate, use, and disclose Ajilon's trade secrets, including but not limited to those described herein. This use and disclosure was done without the express or implied consent of Ajilon.

85.     On information and belief, Defendants either directly owed a duty to maintain the confidentiality of Ajilon's confidential and proprietary information and/or knowingly obtained access to this information by improper means.

86.     On information and belief, the Individual Defendants have disclosed Ajilon's trade secrets to Solomon-Page.

87.     On information and belief, Solomon-Page was not only aware that the Individual Defendants had learned Ajilon's trade secrets in confidence, but it actively encouraged the Individual Defendants to breach that confidence.

88.     As a direct and proximate result of Defendants' continuing acts of use and misappropriation and the threatened use and misappropriation of Ajilon's trade secrets, Ajilon has been damaged.

23

89.     The damage that Ajilon has suffered and continues to suffer from such conduct is irreparable, and Ajilon has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

### COUNT II

(BREACH OF CONTRACT – NON-SOLICITATION PROVISION)

(AGAINST THE INDIVIDUAL DEFENDANTS)

90.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

91.     As discussed above, *infra* at ¶¶ 36-39, the Individual Defendants signed agreements containing Non-Solicitation Provisions, in which the Individual Defendants promised not to directly or indirectly solicit Ajilon's employer clients or prospective employee clients for a period of one year after terminating their employment at Ajilon.

92.     Defendants Smith's and Robey's Employment Agreements further barred them from soliciting any Ajilon customers for one year.

93.     The Individual Defendants have breached their Employment Agreements with Ajilon by soliciting Ajilon clients and candidates within one year of terminating their employment with Ajilon.

94.     On information and belief, Solomon-Page was aware of the Individual Defendants' obligations not to solicit and is profiting from the Individual Defendants' breach.

95.     On information and belief, the Individual Defendants are continuing to violate their contractual obligations under the Non-Solicitation Provisions in their Employment Agreements.

96.     As a direct and proximate result of the Individual Defendants' breaches of their Employment Agreements, Ajilon has been damaged.

97.     The damage that Ajilon has suffered and continues to suffer from such conduct is irreparable, so that Ajilon has no adequate remedy at law.  Such conduct will continue to cause irreparable harm unless restrained by the Court.

## COUNT III

(BREACH OF CONTRACT – CONFIDENTIALITY PROVISION)

(AGAINST THE INDIVIDUAL DEFENDANTS)

98.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

99.     As discussed above, *infra* at ¶¶ 40-42, the Individual Defendants signed agreements containing Confidentiality Provisions, in which the Individual Defendants promised not to use Ajilon's confidential information for his or her own purposes, and each promised not to place any of Ajilon's confidential information onto any personal computer or other data collection device not owned by Ajilon.

100.    The Individual Defendants have breached their Employment Agreements with Ajilon by pilfering Ajilon's Confidential Information, placing it on data collection devices not owned by Ajilon, and/or using it for their own benefit.

101.    In addition, the Individual Defendants have disclosed Ajilon's Confidential Information to Solomon-Page.

102.    On information and belief, Solomon-Page was aware of the Individual Defendants' obligations under the Confidentiality Provisions in their Employment Agreements and is profiting from the Individual Defendants' breach.

103.    On information and belief, the Individual Defendants are continuing to violate their contractual obligations under the Confidentiality Provisions in their Employment Agreements.

104.    As a direct and proximate result of the Individual Defendants' breaches of their Employment Agreements, Ajilon has been damaged.

105.    The damage that Ajilon has suffered and continues to suffer from such conduct is irreparable, so that Ajilon has no adequate remedy at law.  Such conduct will continue to cause irreparable harm unless restrained by the Court.

## COUNT IV

### (BREACH OF CONTRACT – NON-COMPETITION PROVISION)
### (AGAINST THE INDIVIDUAL DEFENDANTS)

106.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

107.    As discussed above, *infra* at ¶¶ 43-46, the Individual Defendants signed agreements containing Non-Competition Provisions, in which the Individual Defendants promised not to compete against Ajilon for a period of one year after terminating their employment with Ajilon.

108.    The Individual Defendants have breached their Employment Agreements with Ajilon by working for Solomon-Page and competing directly with Ajilon.

109.    On information and belief, Solomon-Page was aware of the Individual Defendants' obligations not to compete and is profiting from the Individual Defendants' breach.

110.    On information and belief, the Individual Defendants are continuing to violate their contractual obligations under the Non-Competition Provisions in their Employment Agreements.

111.    As a direct and proximate result of the Individual Defendants' breaches of their Employment Agreements, Ajilon has been damaged.

112.    The damage that Ajilon has suffered and continues to suffer from such conduct is irreparable, so that Ajilon has no adequate remedy at law.  Such conduct will continue to cause irreparable harm unless restrained by the Court.

## COUNT V

### (BREACH OF THE DUTY OF LOYALTY)

### (AGAINST THE INDIVIDUAL DEFENDANTS)

113.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

114.    The Individual Defendants owe a fiduciary duty of loyalty to Ajilon by virtue of their employment, duties, and responsibilities as Executive Recruiters for Ajilon.

115.    While employed at Ajilon, the Individual Defendants diverted business opportunities belonging to Ajilon to themselves and Solomon-Page.

116.    The Individual Defendants have breached their fiduciary duties to Ajilon by soliciting clients and candidates on behalf of Solomon-Page, an Ajilon competitor, and in an effort to injure Ajilon.

117.    As a direct and proximate result of this conduct, Ajilon has been damaged.

118.    The damage that Ajilon has suffered and continues to suffer from such conduct is irreparable, and Ajilon has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

## COUNT VI

### (TORTIOUS INTERFERENCE WITH CONTRACT)

### (AGAINST DEFENDANTS SOLOMON-PAGE AND SMITH)

119.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

120.    On information and belief, Defendant Solomon-Page has been targeting Ajilon employees throughout the country in an attempt to access Ajilon clients and candidates.

121.    Defendants Robey, Zizzo, and Sobotko entered into valid Employment Agreements when they became employed by Ajilon.  Those Employment Agreements contain provisions that continue after termination of employment, including the Confidentiality Provisions.

122.    On information and belief, Defendants Solomon-Page and Smith knew, or had reason to know, of the existence of the Employment Agreements that Ajilon had entered into with Defendants Robey, Zizzo, and Sobotko.

123.    On information and belief, Defendants Solomon-Page and Smith knowingly and intentionally interfered with Defendants Robey's, Zizzo's, and Sobotko's compliance with their Employment Agreements inducing them to take Ajilon's confidential information, solicit Ajilon's clients and solicit Ajilon's employees in violation of the express terms of their Employment Agreements.  Defendants Robey, Zizzo, and Sobotko would not have breached

their agreements with Ajilon, were it not for the wrongful activities of Defendants Solomon-Page and Smith.

124.    As a direct and proximate result of Defendants Solomon-Page's and Smith's conduct, Ajilon has been damaged.

125.    The damage that Ajilon has suffered and continues to suffer from Solomon-Page's and Smith's conduct is irreparable, and Ajilon has no adequate remedy at law. Such conduct will continue to cause such irreparable harm unless restrained by this Court.

## COUNT VII

### (VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030)
### (AGAINST DEFENDANT SMITH)

126.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

127.    On more than one occasion, including on January 23, 2008, Smith intentionally accessed Ajilon's computers and, exceeding his authorized access, obtained information from an Ajilon computer used in interstate commerce or communication, to wit, Smith copied files and data residing on an Ajilon computer for the benefit of the Individual Defendants and Solomon-Page and in order to compete with Ajilon.

128.    On information and belief, Smith was in Long, Island, New York, when he downloaded these files.

129.    Smith's accessing of Ajilon's computers involved a communication with Ajilon's computer servers located in North Carolina.

130.    Ajilon has suffered damages and losses as a result of Smith's conduct in excess of $5,000 during the immediately preceding 1-year period.

131.     The damage that Ajilon has suffered and continues to suffer Smith's conduct is irreparable, and Ajilon has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

## COUNT VIII

### (CIVIL CONSPIRACY TO VIOLATE THE COMPUTER FRAUD AND ABUSE ACT)

### (AGAINST ALL DEFENDANTS)

132.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

133.     The Defendants entered into an agreement to obtain confidential materials belonging to Ajilon through misappropriation of its trade secrets and through accessing Ajilon's computers in excess of their authority to do so, as prohibited by the Computer Fraud and Abuse Act, in order to unfairly compete with Ajilon.

134.     One or more of the Defendants has misappropriated Ajilon's trade secrets and Defendant Smith accessed Ajilon's computers in excess of his authority to do so and obtained information from those computers.

135.     The Defendants intentionally participated in this agreement in furtherance of their plan for the Individual Defendants to leave Ajilon's employ and to work for Solomon-Page and to unfairly compete with Ajilon.

136.     Ajilon has been damaged as a result of Defendants' conspiracy.

137.     The damage that Ajilon has suffered and continues to suffer from such conduct is irreparable, and Ajilon has no adequate remedy at law.  Such conduct will continue to cause such irreparable harm unless restrained by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in its favor against Defendants, as follows:

A.      Enjoining the Defendants Smith and Robey from working at another employment agency or temporary help service placing primarily temporary and/or permanent financial personnel, *i.e.*, financial executives, accountants, bookkeepers, accounting clerks, etc., or a general employment agency or temporary help service by whom employee is employed to place primarily temporary and/or permanent financial personnel, within fifty (50) miles of Hauppauge, New York, for the applicable one-year period;

B.      Enjoining Defendants Zizzo and Sobotko from working at a staffing service that places financial personnel including but not limited to chief financial officers, controllers, other financial executives, accountants, bookkeepers, and accounting clerks, within thirty-five (35) miles of Hauppauge, New York, for the applicable one-year period;

C.      Enjoining Defendants Smith and Robey from soliciting any Ajilon clients and/or candidates for the applicable one-year period;

D.      Enjoining Defendants Zizzo and Sobotko from soliciting any Ajilon clients and/or candidates that have conducted business with the Hauppauge office for the applicable one-year period;

E.      Enjoining the Individual Defendants from disclosing, in whole or in part, Ajilon's confidential information, including the identities of Ajilon's clients and applicants, Ajilon's financial information, Ajilon's specific training and marketing techniques or Ajilon's forms and procedures;

F.      Enjoining Defendants Solomon-Page and Smith from tortiously interfering with Ajilon's contractual relation with Defendants Robey, Zizzo, and Sobotko;

31

G.       Enjoining Defendants Smith and Solomon-Page from using and/or disclosing any information downloaded by Smith on his Ajilon-issued laptop;

H.       Awarding Plaintiff damages for the violation of the Computer Fraud and Abuse Act by Defendants Solomon-Page and Smith;

I.        Awarding Plaintiff punitive damages;

J.        Awarding Plaintiff attorneys' fees; and

K.       Granting such other and further relief as this Court deems just or proper.


Dated: New York, New York
      February 6, 2008

Adam H. Offenhartz (AO-0952)
Cynthia S. Arato (CA-8350)
Michelle M. Craven (MC-8556)
D. Cameron Moxley (DM-4371)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue, 47th Floor
New York, New York 10166

*Attorneys for Plaintiff Ajilon Professional Staffing, LLC*

100380987_6.DOC